(118 App. Div. 350)

SECURITY WAREHOUSING CO. v. AMERICAN EXCII. NAT. BANK.

(Supreme Court, Appellate Division, First Department.   March 22, 1907.)

1. CORPORATIONS—OFFICERS—INDIVIDUAL INTEREST—BANKS—PAYMENT OF UNAUTHORIZED CHECK.

In an action against a bank for accepting a check of the plaintiff corporation, which on its face showed that the officers of plaintiff had no authority to issue it, evidence examined, and *held* to show that the corporation had treated the tort of the officers as a debt, and had accepted in payment of the debt a note of a third person together with other securities.

2. SAME—WAIVER OF TORT.

Where the officers of a corporation without authority borrowed money from the corporation by issuing its check signed by them as officers, and the corporation chose to waive the tort and treat the claim as a debt against the officers, an acceptance of money, notes, and other security in discharge of the debt released the bank which accepted the check from liability to the corporation, even though it accepted the check with notice that the officers had no authority to issue it.

3. NOVATION—SUBSTITUTION OF NEW DEBTOR—OPERATION AND EFFECT.

Where a corporation as creditor accepts in payment of a debt the note of a third person together with valuable security, a novation is effected, and it can thereafter look only to the substituted debtor for reimbursement.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Novation, § 5.]

Appeal from Judgment on Report of Referee.

Action by the Security Warehousing Company against the American Exchange National Bank.   Judgment for plaintiff, and defendant appeals.   Reversed, and new trial granted.

Argued before PATTERSON, P. J., and McLAUGHLIN, INGRAHAM, and HOUGHTON, JJ.

Benjamin H. Cardozo, for appellant.
Edwin B. Smith, for respondent.

HOUGHTON, J.   On the 15th day of December, 1902, Messrs. Greig, Goodrich & Dresser were 3 of the 15 directors of plaintiff. Greig was president and Goodrich vice president, and both were members of the executive committee of five, of which one Driggs was chairman.   Greig, Goodrich & Dresser were indebted to the defendant upon a loan of $75,000 secured by 500 shares of stock of the Trust Company of the Republic.   On the day specified, Greig directed the secretary of plaintiff to draw a check upon its funds, payable to Greig's order for the sum of $22,500 for the purpose, as was stated, of buying stock of the Trust Company of the Republic.   This was done, and signed by Greig as president, and countersigned by the secretary and indorsed to the defendant, which accepted it in reduction of the Greig, Goodrich & Dresser loan, surrendering 150 shares of the collateral stock.   Thereupon these three individuals executed a note to the plaintiff, payable in four months, pledging such 150 shares as collateral security for its payment.   The plaintiff had a surplus of funds which it invested.   At an appointed meeting of the executive committee on January 28, 1903, at which it does not appear that any one attended save Greig and Driggs, the chairman, Greig submitted to

the chairman a statement of the outstanding loans and investments, showing in the neighborhood of $140,000 loaned or invested besides the amount in controversy. The chairman inquired concerning the note of $22,500 secured by the collateral, and when it was explained to him he objected to it on the ground that it was a time loan, and that the transaction was in the nature of banking business which the plaintiff was not authorized to transact. Thereupon Greig assured the chairman that he would see that the loan was taken up.

Between this time and the 20th of March following, at which at least four of the executive committee were present, together with the counsel of the plaintiff, the president had negotiated a loan from the plaintiff to one Hunt of $21,000 taking his demand note therefor, with 140 shares of the Trust Company of the Republic and 100 shares of the International Bank & Trust Company pledged as collateral, taking up the note of himself and associates therewith, and he reported to the committee that the loan of $22,500 which had been objected to had been paid. It appears that 10 shares of the stock of the Trust Company of the Republic had been then or was subsequently, sold and $1,500 turned in to the plaintiff. On the 6th of April following, the Hunt loan was again discussed, and additional collateral resolved to be called for, and at a special meeting of the directors held on the 16th of the same month, the president reported that in pursuance to instructions from the executive committee, he had asked and received from Mr. Hunt 50 shares more of the International Bank & Trust Company's stock as collateral. At another meeting of the directors on the 30th of that month, the secretary read a report of a special auditor of the books of plaintiff, which set forth the loan to Hunt, and did not contain the original loan to Greig and his associates. During the months of April, June, and July, 1903, the plaintiff, through its secretary, and by direction either of its board of directors or the executive committee, had correspondence with Hunt demanding additional security or the payment of the loan, and threatening legal prosecution, which resulted in the increasing of the collateral to 200 shares of the International Bank & Trust Company stock in addition to the 140 shares of stock of the Trust Company of the Republic. This, for the time being, seems to have been satisfactory to the plaintiff, after it had made inquiry as to the market value of the International Bank & Trust Company stock, which was selling above par.

The Hunt loan in the various resolutions and communications is mentioned indifferently as $22,500 and $21,000; but it is conceded that $21,000 is the proper figure. In October following there was a change in the management of plaintiff, and a new president was elected, and a new executive committee was appointed. After various consideration and discussion, the new executive committee authorized Mr. Barker, one of its members, to negotiate with Hunt for the extension of the time of payment of his note to two or three years, if in his judgment it seemed for the best interests of the company so to do. These negotiations resulted in a written agreement, dated the 30th of December, 1903, between Hunt and the plaintiff, which recited the giv-

ing of the note, no part of which had been paid, and that there was $22,022 due thereon, and provided as follows:

"Now therefore, in consideration of the premises, and the further consideration of $1 by each of the parties hereto to the other in hand paid, the receipt whereof is hereby acknowledged, it is agreed that the party of the first part shall pay interest on the sum of $22,022, his present indebtedness to the company, in semiannual payments, on the 1st day of July and January, beginning on the 1st day of July, 1904, at the office of said company, at the rate of 5 per cent. per annum; and the said company agrees that so long as payment of said interest is regularly made at the times, and in the manner above set forth, it will refrain for the space of three years from the date hereof, from making any further demand, and from taking any legal proceedings against the party of the first part, to enforce the payment of the amount now due."

During the summer of 1903, and presumably up to the time of the agreement of December 30th, the market value of the collateral to the Hunt note, exceeded its amount with interest, and at one period of that time such value was some $12,000 in excess thereof. Although the check for $22,500 was returned to plaintiff in January, 1903, it is claimed its form did not come to the attention of the board of directors of plaintiff until the latter part of October of that year. On the 1st day of February, 1904, the plaintiff demanded that the defendant return to it the $22,500 represented by the check which Greig had given it on the ground that upon its face there was notice that the moneys did not belong to Greig, and that he could not lawfully apply them to his individual debt. This demand was not complied with and in March following the action was brought.

Pending the action, the 140 shares of stock of the Trust Company of the Republic, which had been exchanged for stock of the Commonwealth Trust Company, were sold for $4,200, and on the trial the plaintiff conceded that this sum should be deducted, as well as the $1,500, which it had received when the Hunt note was given; and, although protesting that under the form of the action which it had brought it was not obliged so to do, it tendered to defendant the Hunt note with the remaining collateral therefor.

We cannot concur in the conclusion of the learned referee that the defendant is liable under the facts disclosed, to return to the plaintiff the moneys which it received through the check. Conceding that the form of the check was such as to give the defendant notice that the moneys represented by it did not belong to Greig, but were those of the plaintiff, and that Greig had not authority to use the money of the plaintiff in the manner in which he did, we are of the opinion that the plaintiff so dealt with the unauthorized act of Greig that it lost whatever right it had against the defendant. Even if Greig had no authority to loan the money to himself and his associates, and the taking of it by him was a conversion, still the plaintiff could waive the tort and treat the claim as a debt against him. If Greig paid the debt or restored the money, plaintiff then had no claim against defendant. The action is for conversion. The defendant is not liable unless Greig was also liable. A party injured can have but one satisfaction for the wrongful act, and a full satisfaction from one joint tort-feasor operates as a discharge of all the others. Barret v. Third Avenue Railroad

103 N.Y.S.—26

Company, 45 N. Y. 628.   If Greig paid a part, and gave the obligation of a third party, accepted in payment by defendant for the balance, this was as much a payment as though the whole amount had been paid in cash.   This was precisely what was done.   There can be no doubt that the directors and officers of the plaintiff knew that the note of Hunt for $21,000 with its collateral, $1,500 in cash having been paid, stood in place of the $22,500 note of Greig, Goodrich & Dresser, which had been given for the check.   Nor can there be any doubt that they knew that the prior note had been taken up by the new arrangement and assented to its being so treated, and the referee expressly found that the Hunt transaction operated as a payment of the former obligation.   A novation was thus effected, and plaintiff could thereafter look to the substituted debtor only for reimbursement.   If the note of a third person to give at the time an obligation is entered into, the presumption is that such note was accepted in payment, and the burden is upon the one accepting to show that it was not thus received.   Gibson v. Tobey, 46 N. Y. 637, 7 Am. Rep. 397.   If the note of a third person be given for a past indebtedness, the burden is upon the person giving it to establish that it was accepted in payment.   Noel v. Murray, 13 N. Y. 167.   Even if the latter rule applies, the defendant met the burden of proof for every fact goes to show that the note of Hunt was accepted in payment of the prior obligation of Greig and his associates.   Additional security was continually demanded until the collateral became so satisfactory that after the new board of directors and officers of plaintiff knowing all the facts, entered into an agreement to extend the time of payment of the note for three years, and, if the maker desired, for five, provided the interest was promptly paid.   The result of what was done was that plaintiff not only ratified the loan to Greig, and treated it as such, but accepted in payment of it thereby discharging it, an obligation supposed to be entirely secure and highly satisfactory as evidenced by the extension of time given.

In addition, the plaintiff did not act with such promptness, after knowledge of the situation as the law required.   As early as January, 1903, probably, at least as early as March, and April, 1903, the plaintiff fully understood all the facts in relation to the $22,500 check, except perhaps what bank had cashed it, and it might have ascertained that fact by looking at the check which had been returned to it early in January of that year.   If the defendant was bound to restore the money, it was at least entitled to receive back the 150 shares of Trust Company of the Republic stock which it had surrendered.   At that time this stock was worth at least $150 per share, for 10 shares appear to have been sold for $1,500.   So too, in October, following, when the plaintiff's officers knew that the defendant cashed the check and applied the proceeds to the indebtedness of Greig and his associates, the stock must have continued to have some value, for the plaintiff was satisfied with it as collateral security.   Even if the plaintiff was not obliged earlier to ascertain all the facts, it should have acted promptly in October when it was fully apprised of them. In omitting so to act, it not only continued to ratify the acts of its

former president by its silence, but it failed to perform its duty to the defendant by reducing the damages which it might suffer as much as it was able.

We have not considered the point urged by the appellant that the defendant was a bona fide holder of the check, because it was signed by the secretary as well as the president, for we have concluded that whether the defendant was a bona fide holder or not, it is not liable to the plaintiff.

The judgment must be reversed, and a new trial granted, with costs to the appellant to abide the event. All concur.